# UNITED STATES DISTRICT COURT

for the

Central District of California

|  |  |
|---|---|
| In the Matter of the Search of:<br>Information associated with accounts identified as<br>@AVSRAFFLES, @AVSRLIVE,<br>Facebook.com/alfonso.valdes.1428, and<br>Facebook.com/profile.php?id=61554697241041 that<br>are within the possession, custody, or control of Meta<br>Platforms, Inc. | Case No. **2:25-MJ-00101** |

## APPLICATION FOR WARRANT BY TELEPHONE PURSUANT TO 18 U.S.C. § 2703

I, a federal law enforcement officer, request a warrant pursuant to Title 18, United States Code, Section 2703, and state under penalty of perjury that I have reason to believe that within the following data:

*See Attachment A*

There are now concealed or contained the items described below:

*See Attachment B*

The basis for the search is:

☒ Evidence of a crime;
☒ Contraband, fruits of crime, or other items illegally possessed;
☐ Property designed for use, intended for use, or used in committing a crime.

The search is related to a violation of:

| *Code section(s)* | *Offense Description* |
|---|---|
| 18 U.S.C. § 922(a)(1)(A) | Engaging in the Dealing of Firearms Without a License |
| 18 U.S.C. § 933 | Firearms Trafficking |
| 18 U.S.C. § 922(g)(9) | Prohibited Person in Possession of a Firearm |

The application is based on these facts:

*See attached Affidavit, which is incorporated herein by reference.*

_____
*/S/*
*Applicant's signature*

Victor Muglia, Special Agent, ATF
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

City and State: Los Angeles, California

_____
*Judge's signature*

HON. Alka Sagar, U.S. Magistrate Judge
*Printed name and title*

AUSA: Thomas Magana (x1344)

## <u>ATTACHMENT A</u>

**PROPERTY TO BE SEARCHED**

This warrant applies to information associated with the following Instagram Accounts:

- Username: @AVSRAFFLES (Account Identifier: 63787280069) (SUBJECT ACCOUNT 1); and

- Username: @AVSRLIVE (active on, but not limited to, November 12, 2024) (SUBJECT ACCOUNT 2);

and the following Facebook accounts:

- Username: "Facebook.com/alfonso.valdes.1428" (SUBJECT ACCOUNT 3), and

- Username: "Facebook.com/profile.php?id=61554697241041" (SUBJECT ACCOUNT 4);

that are within the possession, custody, or control of Meta Platforms, Inc., a company that accepts service of legal process at 1601 Willow Road, Menlo Park, California, regardless of where such information is stored, held, or maintained.

## ATTACHMENT B

### ITEMS TO BE SEIZED

**I.   SEARCH PROCEDURES**

1.   The warrant will be presented to personnel of Meta Platforms, Inc. (the "PROVIDER"), who will be directed to isolate the information described in Section II below.

2.   To minimize any disruption of service to third parties, the PROVIDER's employees and/or law enforcement personnel trained in the operation of computers will create an exact duplicate of the information described in Section II below.

3.   The PROVIDER's employees will provide in electronic form the exact duplicate of the information described in Section II below to the law enforcement personnel specified below in Section IV.

4.   With respect to contents of wire and electronic communications produced by the PROVIDER (hereafter, "content records," see Section II.10.a. below), law enforcement agents and/or individuals assisting law enforcement and acting at their direction (the "search team") will examine such content records pursuant to search procedures specifically designed to identify items to be seized under this warrant.  The search shall extract and seize only the specific items to be seized under this warrant (see Section III below).  The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques. The review of the electronic data may

be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized, copied, or disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

5.  The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

6.  The search team will complete its search of the content records as soon as is practicable but not to exceed 120 days from the date of receipt from the PROVIDER of the response to this warrant.  The government will not search the content records beyond this 120-day period without first obtaining an extension of time order from the Court.

7.  Once the search team has completed its review of the content records and created copies of the items seized pursuant to the warrant, the original production from the PROVIDER will be sealed -- and preserved by the search team for authenticity and chain of custody purposes -- until further order of the Court.  Thereafter, the search team will not access the data from the sealed original production which fell outside the scope of the items to be seized absent further order of the Court.

8.   The special procedures relating to digital data found in this warrant govern only the search of digital data pursuant to the authority conferred by this warrant and do not apply to any search of digital data pursuant to any other court order.

9.   Pursuant to 18 U.S.C. § 2703(g) the presence of an agent is not required for service or execution of this warrant.

## II.  <u>INFORMATION TO BE DISCLOSED BY THE PROVIDER</u>

10.  To the extent that the information described in Attachment A is within the possession, custody, or control of the PROVIDER, regardless of whether such information is located within or outside of the United States, including any information that has been deleted but is still available to the PROVIDER, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the PROVIDER is required to disclose the following information to the government for each SUBJECT ACCOUNT listed in Attachment A:

a.   All contents of all wire and electronic communications associated with the SUBJECT ACCOUNTS, including:

i.   All emails, communications, or messages of any kind associated with the SUBJECT ACCOUNT, including stored or preserved copies of messages sent to and from the account, draft messages, deleted messages, and messages maintained in trash or any other folders or tags or labels, as well as all header information associated with each email or message (including the actual IP addresses of the sender and recipients of the emails), and any related documents or attachments.

ii.   All records or other information stored by subscriber(s) of the SUBJECT ACCOUNT, including address books, contact and buddy lists, calendar data, pictures, videos, notes, texts, links, user profiles, account settings, access logs, and files.

iii.  All records or other information stored by subscriber(s) of the SUBJECT ACCOUNT, including posts, stories, shares, likes, tags, comments, mentions, and search history.

iv.   All records pertaining to communications between the PROVIDER and any person regarding the SUBJECT ACCOUNT, including contacts with support services and records of actions taken.

v.    For Instagram Accounts:

(I)   All data and information associated with the profile page of the SUBJECT ACCOUNT, including photographs, "bios," and profile backgrounds and themes;

(II)  All communications or other messages sent or received by the SUBJECT ACCOUNT, including via Instagram Direct;

(III)    All user content created, uploaded, or shared by the SUBJECT ACCOUNT, including any comments made by the SUBJECT ACCOUNT on photographs, videos, or other content;

(IV)  All photographs, videos, images, comments, captions, and hashtags, as well as any metadata associated therewith, in the user gallery for the SUBJECT ACCOUNT;

(V)   All location data associated with the SUBJECT ACCOUNT, or with photographs, videos, or other content, including geotags;

(VI) All records of Instagram searches performed by the SUBJECT ACCOUNT, including all past searches saved by the SUBJECT ACCOUNT;

(VII)     A list of all of the people that the user of the SUBJECT ACCOUNT follows on Instagram and all people who are following the user (i.e., the user's "following" list and "followers" list), as well as any "friends" of the user;

(VIII)     A list of all users that the SUBJECT ACCOUNT has "unfollowed" or blocked;

vi.   For Facebook Accounts:

(I)   All data and information associated with the profile page of the SUBJECT ACCOUNT, including photographs, profile backgrounds, and themes;

(II) All user content created, uploaded, or shared by the SUBJECT ACCOUNT, including any comments made by the SUBJECT ACCOUNT on photographs, videos, or other content;

(III)     All photos and videos uploaded by the SUBJECT ACCOUNT, all photos and videos uploaded by any user that have the SUBJECT ACCOUNT tagged in them, and all photos and videos "liked" or commented on by the user of the SUBJECT ACCOUNT, as well as any metadata associated therewith, including, specifically, EXIF data;

(IV) All profile information, "About Me" information, and Neoprint information, including the user's website; News Feed information, including any information hidden from News Feed; status updates and "recent activities"; links to videos, photographs, articles, and other items; Notes; Wall postings ("Posts by You," "Posts by Others," and "Posts to Others"); friend lists, including persons identified as "family," and including the friends' Facebook user identification numbers and any deleted or removed friends; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; lists of "followers" and "following" accounts; future and past event postings, invitations, and events sent to or joined by the user; "stories" by, tagged, or commented on by the user; places "liked" or visited by the user; "Friend" requests, including Friend requests sent to or from the SUBJECT ACCOUNT, and including Friend requests accepted or rejected; comments; gifts; pokes; tags, including both who has been tagged on the SUBJECT ACCOUNT's profile and when the user of the SUBJECT ACCOUNT has been tagged in other users' profiles; notifications and notification settings of any kind; and any "shares" – i.e. content shared with other Facebook users;

(V) All other records of communications and messages of any kind made or received by the user, including all Messenger activity, private messages, chat history, video and voice calling history, and specifically including all attachments to any messages in their native formats (for

example, if a .zip file was sent to another user, the .zip file shall be provided), as well as the history of communications of any kind, video calling history, and pending "Friend" requests;

(VI) All "Active Sessions" information and activity logs for the account and all other documents showing the user's posts and other Facebook activities;

(VII)    All activity logs for the SUBJECT ACCOUNT and all other documents showing the user's posts and other Facebook activities;

(VIII)    All search history and web history for the user of the SUBJECT ACCOUNT, including records of Facebook searches and internet/web searches, and including web browsing that might occur outside of Facebook, but that Facebook is able to connect to the SUBJECT ACCOUNT when the SUBJECT ACCOUNT visits websites that are using Facebook's webpage "like" functionality;

(IX) All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked" ("Likes on Others' Posts," "Likes on Your Posts from Others," and "Likes on Other Sites"), as well as all information about the Facebook pages of which the account is or was a "fan" and any information in the account's connections;

(X)    All records of Facebook Notes or use of Facebook's web logging or "blogging" features, including importing of blogs from other services;

(XI) All information related to the SUBJECT ACCOUNT's membership in any groups, including the identity of other accounts in the same group, and information identifying any groups or organizational pages or accounts for which the SUBJECT ACCOUNT is an administrator;

(XII)    All past and present lists of friends created or accepted by the SUBJECT ACCOUNT;

(XIII)    Any credit card numbers provided by the user for purchases on Facebook;

(XIV)    A list of all users that the SUBJECT ACCOUNT has "unfollowed" or blocked;

b.    All other records and information for the SUBJECT ACCOUNTS, including:

i.    All subscriber information, including the date on which the account was created, the length of service, the IP address used to register the account, the subscriber's full name(s), screen name(s), any alternate names, other account names or email addresses associated with the account, linked accounts, telephone numbers, physical addresses, and other identifying information regarding the subscriber, including any removed or changed names, email addresses, telephone numbers or physical addresses, the types of service utilized, account status, account settings, login IP addresses associated with session dates and times, as well as means and source of payment, including detailed billing records, **and including any changes made to any subscriber information** or services, including specifically changes made to secondary email accounts, phone numbers, passwords, identity or

address information, or types of services used, and including the
dates on which such changes occurred, for the SUBJECT ACCOUNTS.

       ii.  All user connection logs and transactional
information of all activity relating to the SUBJECT ACCOUNT
described above in Section II.10.a., including all log files,
dates, times, durations, data transfer volumes, methods of
connection, IP addresses, ports, routing information, dial-ups,
and locations, and including specifically the specific product
name or service to which the connection was made.

       iii.  All information about connections between
the SUBJECT ACCOUNTS and third-party websites and applications;

       iv.  All "check ins" and other location data
associated with the SUBJECT ACCOUNT;

       v.  All privacy settings and other account
settings, including privacy settings for individual Facebook
posts and activities, privacy settings that apply to certain
lists of Facebook friends and the accompanying lists, and all
records showing which Facebook users have been blocked by the
SUBJECT ACCOUNT;

       vi.  All information about the user's access and
use of Facebook Marketplace.

       vii.  All Instagram privacy and account settings
of the SUBJECT ACCOUNT, including past and present account
status;

III. **INFORMATION TO BE SEIZED BY THE GOVERNMENT**

11. For each SUBJECT ACCOUNT listed in Attachment A, the search team may seize:

a.   All information described above in Section II.10.a. that constitutes evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 922(g)(9) (prohibits possession of a firearm if convicted of a misdemeanor crime of domestic violence), 18 U.S.C. § 922(a)(1)(A) (Engaging in the Business of Dealing Firearms Without a License); and 18 U.S.C. § 933 (Firearms Trafficking) (the "Subject Offenses"), namely:

i.   Information relating to who created, accessed, or used the SUBJECT ACCOUNT, including records about their identities and whereabouts.

ii.   Information related to how and when the SUBJECT ACCOUNT was accessed or used;

iii.  Information relating to the purchase, sale, distribution, possession and/or procurement of controlled substances or firearms, and the advertisement of controlled substances or firearms for sale, including audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of drugs or firearms;

iv.   Information relating to the proceeds of the sale or distribution of controlled substances or firearms, including the creation and use of bank, financial and

cryptocurrency accounts, and records related to cryptocurrency, bank, and wire transactions;

     v. Information relating to co-conspirators engaged in the SUBJECT OFFENSES, which could include information relating to their identities, whereabouts, communications, and methods of contact and communication;

  b. All records and information described above in Section II.10.b.

## IV. **PROVIDER PROCEDURES**

 12. IT IS ORDERED that the PROVIDER shall deliver the information set forth in Section II within 10 days of the service of this warrant.  The PROVIDER shall send such information to:

Victor Muglia
550 N Brand Blvd
Glendale, CA 91203
(818)858-2982
Victor.muglia@atf.gov

 13. IT IS FURTHER ORDERED that the PROVIDER shall provide the name and contact information for all employees who conduct the search and produce the records responsive to this warrant. IT IS FURTHER ORDERED, pursuant to 18 U.S.C. § 2705(b), that the PROVIDER shall not notify any person, including the subscriber(s) of each account identified in Attachment A, of the existence of the warrant, until further order of the Court, until written notice is provided by the United States Attorney's Office that nondisclosure is no longer required, or until one year from the date this warrant is signed by the magistrate judge or such later date as may be set by the Court upon

application for an extension by the United States.  Upon expiration of this order, at least ten business days prior to disclosing the existence of the warrant, the PROVIDER shall notify the agent identified in paragraph 12 above of its intent to so notify.

## AFFIDAVIT

I, Victor Muglia, being duly sworn, declare and state as follows:

### I.   INTRODUCTION

1.   I am a Special Agent ("SA") with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and have been so employed since January 2024. I am currently assigned to the Glendale Field Office of the Los Angeles Field Division of ATF, which conducts investigations into violations of federal firearms, explosives, and narcotics laws.  My experience as an ATF SA includes, but is not limited to, conducting physical surveillance, executing search and arrest warrants, and participating in controlled drug/gun purchases using informants. I have experience investigating violations of federal statutes governing firearms and narcotics.  I have also conducted surveillance of individuals trafficking firearms and illegal controlled substances, and persons possessing illegal firearms. As part of my training, I attended the Criminal Investigator and Special Agent Basic Training Academies for ATF at the Federal Law Enforcement Training Center in Glynco, Georgia for approximately 27 weeks.  This training included instruction on federal and state firearms and narcotics laws and regulations.

2.   I make this affidavit in support of an application for a warrant for information associated with the following accounts: Username: @AVSRAFFLES (Account Identifier: 63787280069) ("SUBJECT ACCOUNT 1"), Username: @AVSRLIVE (active on, but not limited to, November 12,2024) ("SUBJECT ACCOUNT 2"),

"Facebook.com/alfonso.valdes.1428" ("SUBJECT ACCOUNT 3"), and
"Facebook.com/profile.php?id=61554697241041" ("SUBJECT ACCOUNT
4") (collectively, the "SUBJECT ACCOUNTS") that are stored at
premises controlled by Meta Platforms, Inc.(the "PROVIDER"), a
provider of electronic communication and remote computing
services that accepts service of legal process at 1601 Willow
Road, Menlo Park, California.[1]  The information to be searched
is described in Attachment A.  This affidavit is made in support
of an application for a warrant under 18 U.S.C. §§ 2703(a),
2703(b)(1)(A), 2703(c)(1)(A) and 2703(d)[2] to require the

---

[1] Because this Court has jurisdiction over the offenses
being investigated, it may issue the warrant to compel the
PROVIDER pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A), (c)(1)(A).
See 18 U.S.C. §§ 2703(a) ("A governmental entity may require the
disclosure by a provider . . . pursuant to a warrant issued
using the procedures described in the Federal Rules of Criminal
Procedure . . . by a court of competent jurisdiction") and 2711
("the term 'court of competent jurisdiction' includes -- (A) any
district court of the United States (including a magistrate
judge of such a court) or any United States court of appeals
that -- (i) has jurisdiction over the offense being
investigated; (ii) is in or for a district in which the provider
of a wire or electronic communication service is located or in
which the wire or electronic communications, records, or other
information are stored; or (iii) is acting on a request for
foreign assistance pursuant to section 3512 of this title").

[2] The government is seeking non-content records pursuant to
18 U.S.C. § 2703(d).  To obtain the basic subscriber
information, which does not contain content, the government
needs only a subpoena.  See 18 U.S.C. § 2703(c)(1), (c)(2).  To
obtain additional records and other information--but not
content--pertaining to subscribers of an electronic
communications service or remote computing service, the
government must comply with the dictates of section
2703(c)(1)(B), which requires the government to supply specific
and articulable facts showing that there are reasonable grounds
to believe that the records or other information sought are
relevant and material to an ongoing criminal investigation in
order to obtain an order pursuant to 18 U.S.C. § 2703(d).  The
requested warrant calls for both records containing content (see
Attachment B paragraph II.10.a.) as well as subscriber records
*(footnote cont'd on next page)*

PROVIDER to disclose to the government copies of the information (including the content of communications) described in Section II of Attachment B.  Upon receipt of the information described in Section II of Attachment B, law enforcement agents and/or individuals assisting law enforcement and acting at their direction will review that information to locate the items described in Section III of Attachment B.  Attachments A and B are incorporated herein by reference.

3.  As described more fully below, I respectfully submit there is probable cause to believe that the information associated with the SUBJECT ACCOUNTS constitutes evidence, contraband, fruits, or instrumentalities of criminal violations of 18 U.S.C. § 922(a)(1)(A) (Engaging in the Business of Dealing Firearms Without a License); 18 U.S.C. § 933 (Firearms Trafficking); and 18 U.S.C. § 922(g)(9) (Domestic Violence Misdemeanant in Possession of a Firearm) (the "Subject Offenses").

4.  The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all

---

and other records and information that do not contain content (see Attachment B paragraph II.10.b.).

conversations and statements described in this affidavit are related in substance and in part only.

## II.  SUMMARY OF PROBABLE CAUSE

5.  On or about August 19, 2024, Alfonso VALDES, who was convicted of Battery on Spouse, a violation of California Penal Code 243(e)(1) and a domestic violence misdemeanor, offered to sell firearms to an ATF confidential informant ("CI") via cell phone text messages and pictures. In that same conversation, VALDES sent a text to the CI using the profile name "@AVSraffles" (i.e., SUBJECT ACCOUNT 1).[3] Upon account review of the public profile of SUBJECT ACCOUNT 1, I determined the profile was used to raffle off various pistols, rifles, large capacity magazines, and other firearm related products. I observed VALDES in Instagram videos holding and manipulating firearms he is raffling off. VALDES is a prohibited person and does not hold a Federal Firearms License.

6.  SUBJECT ACCOUNT 1 was made private and now the public description of SUBJECT ACCOUNT 1 reads "Private Page must Vouch your Friends Gotta Play 2 win #GetLucky Zelle/Cashapp instant payouts Games hosted IG Live on @avrslive". This description references SUBJECT ACCOUNT 2 and suggests the raffles are held on the alternate profile named "@avsrlive" (i.e., SUBJECT ACCOUNT 2).

7.  A public search of Facebook also revealed two public Facebook profiles to VALDES (SUBJECT ACCOUNT 3 and 4). These

---

[3] SUBJECT ACCOUNT 1 is associated with Identifier: 63787280069, and has since been renamed "@Getluckyplay2win".

accounts have the username of "Alfonso Valdes" and have photographs of him throughout. In both accounts he has posted videos of firearms with a labeling text referencing @Getluckyplay2win (SUBJECT ACCOUNT 1).

8.    Accordingly, there is probable cause to believe that a search of the SUBJECT ACCOUNTS will yield evidence of the Subject Offenses.

### III. <u>STATEMENT OF PROBABLE CAUSE</u>

**A. VALDES offers to sell firearms to a CI**

9.    On August 19, 2024, an ATF confidential informant (CI)[4] was in communication with a subject, later identified as VALDES. The CI had initially contacted VALDES about purchasing a dog that VALDES had posted for sale, and met with him in person. After the CI and VALDES met in person regarding the dog, they also eventually they began discussing firearms. On August 19, 2024, VALDES offered to sell the CI firearms. On or about that date, via text message using the phone number (909) 704-7635 (the "7635 Number"), the subject sent the CI pictures of firearms with prices attached. In that same conversation the subject sent a text to the CI that read "@AVSraffles" (SUBJECT ACCOUNT 1).

---

[4] The CI has a felony conviction for Evading a peace officer: Disregard Safety in violation of California Vehicle Code 2800.2(A) on 3/09/2013, and a felony conviction for Receive/poses an NFA Firearm not registered in NFRTR in violation of 26 USC 5861 (D) on 4/10/2023.  The CIs primary motivation is financial gain and has proved reliable in the past.

**B. Identification of the 7635 Number**

10.  I queried the 7635 Number on a public records database (Accurint) and learned that it was subscribed to Alfonso De Jesus VALDES (DOB: 5/6/1997). I presented a Department of Motor Vehicles photo of VALDES to the CI and the CI confirmed that that was the subject, as the CI had met him in person in the past. The CI also provided a screen shot of a FaceTime conversation the CI had with VALDES. In the screenshot, VALDES had tattoos on his neck, one of which is an angel. This tattoo is a very prominent tattoo and is visible in pictures VALDES has posted of himself across all four SUBJECT ACCOUNTs.

11.  I served a Grand Jury subpoena on T-Mobile for the subscriber information the 7635 Number.  The subpoena returns showed that the account belongs to Rosa P Silva with the address of 3124 JAGUAR WAY APT C, ONTARIO, CA 91764 USA. VALDES has this same address listed on his California driver's license.

**C. VALDES' Instagram and Facebook Accounts**

12.  In the same conversation described above, VALDES sent a text to the CI that read "@AVSraffles". Upon review of the public profile, the @AVSraffles profile was used to raffle off various pistols, rifles, large capacity magazines, and other firearm related products. The account also had videos of VALDES handling and displaying various weapons that were available to win in his raffle. Although VALDES appeared in these videos with a covering over his nose and mouth, his neck tattoos were clearly visible and matched the tattoos visible in the photo of VALDES that was previously provided by the CI.

13.  I served a Grand Jury subpoena on Meta Inc. for the subscriber information on the Instagram account "@AVSraffles". The subpoena returned that that account belonged to an account owner with the 7635 Number.

14.  Public information on the profile "@AVSraffles" states it was created in December of 2023 and has undergone 6 name changes. The name of the profile is currently "@getluckyplay2win". "@getluckyplay2win" has been switched from a public profile (previously) to a private profile (currently). The description of the page which is written by the user states: "Private Page must Vouch your Friends Gotta play 2 win # GetLucky Zelle/cash app instant payout Games Hosted IG Live on @avsrlive". This suggests the raffles are held on the alternate profile named "@avsrlive" (SUBJECT ACCOUNT 2).

15.  I queried Facebook and found that VALDES has two Facebook profiles which are public.  The profiles are listed with the following Facebook identifying numbers:

a.  Facebook Account 1 Username Alfonso Valdes (Facebook.com/alfonso.valdes.1428) (i.e., SUBJECT ACCOUNT 3); and

b.  Facebook Account 2 Username Alfonso Valdes (Facebook.com/profile.php?id=61554697241041) (i.e., SUBJECT ACCOUNT 4).

16.  In both public profiles VALDES posts pictures and videos of himself. The profiles show multiple pictures of himself with his unique neck tattoo of an angel.

17.  In SUBJECT ACCOUNT 3, on July 14, 2024, VALDES posted multiple pictures to his "stories". The pictures showed Glock pistols (in what appear to be their original box) with the text "Glockboyz". One of the stories is a video of him holding a Glock pistol with the text of "Gone".

18.  In SUBJECT ACCOUNT 4, on November 8, 2024, VALDES posted a video with three identical tan colored Sig P320 pistols with text that has the Instagram logo and "@GETLUCKYPLAY2WIN". On that same date VALDES posted a video with multiple firearms with the same text linking his Instagram profile "@GETLUCKYPLAY2WIN" (SUBJECT ACCOUNT 1). In this video one of the firearms appears to have a silencer attached.

**D. VALDES' Criminal History**

19.  On September 2, 2024, I reviewed certified conviction documents for VALDES and learned that VALDES has been previously convicted of a misdemeanor crime of domestic violence: On or about November 3, 2022, a violation of California Penal Code Section 243(e)(1)- Battery on Spouse/Cohabitating/Non cohabitating Former Spouse/ETC., in the Superior Court for the State of California, County of San Bernardino, Case Number MWV22015115. VALDES also has a misdemeanor conviction for Exhibit deadly weapon/fire/arm (California Penal Code Section 417(a).

**E. VALDES does not possess a Federal Firearms License**

20.  On October 11, 2024, Industry Operations Investigator Alberto Gomez searched the federal licensing system and confirmed that VALDES does not have a Federal Firearms License,

which is required to engage in the business of
dealing/importing/manufacturing firearms.

**F. Preservation Requests for the Subject Accounts**

21.  On approximately August 22, 2024, I sent the PROVIDER
a preservation letter requesting that information associated
with SUBJECT ACCOUNT 1 be preserved for 90 days pursuant to 18
U.S.C. § 2703(f).

22.  On approximately November 12, 2024, I sent the
PROVIDER a preservation letter requesting that information
associated with SUBJECT ACCOUNT 2 be preserved for 90 days
pursuant to 18 U.S.C. § 2703(f).

23.  On approximately November 29, 2024, I sent the
PROVIDER a preservation letter requesting that information
associated with SUBJECT ACCOUNT 3 and SUBJECT ACCOUNT 4 be
preserved for 90 days pursuant to 18 U.S.C. § 2703(f).

24.  Other than what has been described herein, to my
knowledge the United States has not attempted to obtain the
contents of the SUBJECT ACCOUNTS by other means.

## IV.  <u>SERVICES PROVIDED BY INSTAGRAM</u>

25.  Based on a review of information provided by Meta
Platforms, Inc. and Instagram regarding Instagram's services,
information provided by other law enforcement officers, and/or
my training and experience, I am aware of the information
contained in this section of the affidavit regarding Instagram.

26.  Instagram is a free-access social networking service
owned by Meta Platforms, Inc. ("Meta"), accessible through its
website and its mobile applications, that allows subscribers to

acquire and use Instagram accounts, like the SUBJECT ACCOUNTS, through which users can share messages, multimedia, and other information with other Instagram users and the general public.[5]

27. Meta collects basic contact and personal identifying information from users during the Instagram registration process. This information, which can later be changed by the user, may include the user's full name, birth date, gender, contact e-mail addresses, physical address, telephone numbers, credit card or bank account number, and other personal identifiers. Meta keeps records of changes made to this information.

28. Meta also collects and retains information about how each user accesses and uses Instagram. This includes information about the IP addresses used to create and use an account, unique identifiers and other information about devices and web browsers used to access an account, as well as session times and durations. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access a SUBJECT ACCOUNT.

29. Each Instagram account is identified by a unique username chosen by the user. Users can change their usernames whenever they choose but no two users can have the same usernames at the same time. Instagram users can create multiple accounts and, if "added" to the primary account, can switch

---

[5] Meta also owns other social networking and communications platforms, including Facebook and WhatsApp.

between the associated accounts on a device without having to
repeatedly log-in and log-out.

30.  Instagram users can also connect their Instagram and
Facebook accounts to utilize certain cross-platform features,
and multiple Instagram accounts can be connected to a single
Facebook account.  Instagram accounts can also be connected to
certain third-party websites and mobile apps for similar
functionality.  For example, an Instagram user can "tweet" an
image uploaded to Instagram to a connected Twitter account or
post it to a connected Facebook account, or transfer an image
from Instagram to a connected image printing service.  Meta
maintains records of changed Instagram usernames, associated
Instagram accounts, and previous and current connections with
accounts on Facebook and other third-party websites and mobile
apps.

31.  Instagram users can "follow" other users to receive
updates about their posts and to gain access that might
otherwise be restricted by privacy settings (for example, users
can choose whether their posts are visible to anyone or only to
their followers).  Users can also "block" other users from
viewing their posts and searching for their account, "mute"
users to avoid seeing their posts, and "restrict" users to hide
certain activity and prescreen their comments.  Instagram also
allows users to create a "close friends list" for targeting
certain communications and activities to a subset of followers.

32.  Users have several ways to search for friends and
associates to follow on Instagram, such as by allowing Meta to

access the contact lists on their devices to identify which
contacts are Instagram users.  Meta retains this contact data
unless deleted by the user and periodically syncs with the
user's devices to capture changes and additions.  Users can
similarly allow Meta to search an associated Facebook account
for friends who are also Instagram users.  Users can also
manually search for friends or associates.

33.  Each Instagram user has a profile page where certain
content they create and share ("posts") can be viewed either by
the general public or only the user's followers, depending on
privacy settings.  Users can customize their profile by adding
their name, a photo, a short biography ("Bio"), and a website
address.

34.  One of Instagram's primary features is the ability to
create, edit, share, and interact with photos and short videos.
Users can upload photos or videos taken with or stored on their
devices, to which they can apply filters and other visual
effects, add a caption, enter the usernames of other users
("tag"), or add a location.  These appear as posts on the user's
profile.  Users can remove posts from their profiles by deleting
or archiving them.  Archived posts can be reposted because,
unlike deleted posts, they remain on Meta's servers.

35.  Users can interact with posts by liking them, adding
or replying to comments, or sharing them within or outside of
Instagram.  Users receive notification when they are tagged in a
post by its creator or mentioned in a comment (users can
"mention" others by adding their username to a comment followed

by "@").  An Instagram post created by one user may appear on
the profiles or feeds of other users depending on a number of
factors, including privacy settings and which users were tagged
or mentioned.

36.  An Instagram "story" is similar to a post but can be
viewed by other users for only 24 hours.  Stories are
automatically saved to the creator's "Stories Archive" and
remain on Meta's servers unless manually deleted.  The usernames
of those who viewed a story are visible to the story's creator
until 48 hours after the story was posted.

37.  Instagram allows users to broadcast live video from
their profiles.  Viewers can like and add comments to the video
while it is live, but the video and any user interactions are
removed from Instagram upon completion unless the creator
chooses to send the video to IGTV, Instagram's long-form video
app.

38.  Instagram Direct, Instagram's messaging service,
allows users to send private messages to select individuals or
groups.  These messages may include text, photos, videos, posts,
videos, profiles, and other information.  Participants to a
group conversation can name the group and send invitations to
others to join.  Instagram users can send individual or group
messages with "disappearing" photos or videos that can only be
viewed by recipients once or twice, depending on settings.
Senders can't view their disappearing messages after they are
sent but do have access to each message's status, which
indicates whether it was delivered, opened, or replayed, and if

the recipient took a screenshot.  Instagram Direct also enables users to video chat with each other directly or in groups.

39.  Instagram offers services such as Instagram Checkout and Facebook Pay for users to make purchases, donate money, and conduct other financial transactions within the Instagram platform as well as on the Facebook platform and other associated websites and apps.  Meta collects and retains payment information, billing records, and transactional and other information when these services are utilized.

40.  Instagram has a search function which allows users to search for accounts by username, user activity by location, and user activity by hashtag.  Hashtags, which are topical words or phrases preceded by a hash sign (#), can be added to posts to make them more easily searchable and can be "followed" to generate related updates from Instagram.  Meta retains records of an Instagram user's search history and followed hashtags.

41.  Meta also collects and retains location information relating to the use of an Instagram account, including user-entered location tags and location information used by Meta to personalize and target advertisements.

42.  Meta also uses information it gathers from its platforms and other sources about the demographics, interests, actions, and connections of its users to select and personalize ads, offers, and other sponsored content.  Meta maintains related records for Instagram users, including information about their perceived ad topic preferences, interactions with ads, and advertising identifiers.  In my training and experience, this

data can provide information that can also be used to identify the user(s) of a SUBJECT ACCOUNT.

43.  In some cases, Instagram users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Meta typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

44.  For each Instagram user, Meta collects and retains the content and other records described above, sometimes even after it is changed by the user (including usernames, phone numbers, email addresses, full names, privacy settings, email addresses, and profile bios and links).

45.  In my training and experience, the stored communications and files described above connected to a SUBJECT ACCOUNT may provide direct evidence of the offenses under investigation and may constitute evidence of the crimes under investigation because the information can be used to identify the user(s) of a SUBJECT ACCOUNT.  In addition, emails, instant messages, internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

46.  In my training and experience, a user's account activity, logs, stored electronic communications, and other data retained by Meta can also be used to identify the user(s) of a

SUBJECT ACCOUNT.  For example, subscriber information, IP address logs, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time.  Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crimes under investigation.

### V.    SERVICES PROVIDED BY FACEBOOK

47.  Based on a review of information provided by Meta Platforms, Inc. and Facebook regarding Facebook's services, information provided by other law enforcement officers, and/or my training and experience, I am aware of the information contained in this section of the affidavit regarding Facebook.

48.  Facebook is a free-access social networking service owned by Meta Platforms, Inc. ("Meta"), accessible through its website and its mobile applications, that allows its users to establish Facebook accounts (like the SUBJECT ACCOUNTS) that users can then use to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.[6]

49.  Meta asks Facebook users to provide basic contact and personal identifying information, either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact email addresses, Facebook

---

[6] Meta also owns other social networking and communications platforms, including Instagram and WhatsApp.

passwords, physical address (including city, state, and zip
code), telephone numbers, screen names, websites, and other
personal identifiers.  Facebook also assigns a user
identification number to each account.

50.  Facebook users may join one or more groups or networks
to connect and interact with other users who are members of the
same group or network.  Facebook assigns a group identification
number to each group.  A Facebook user can also connect directly
with individual Facebook users by sending each user a "Friend
Request."  If the recipient of a "Friend Request" accepts the
request, then the two users will become "Friends" for purposes
of Facebook and can exchange communications or view information
about each other.  Each Facebook user's account includes a list
of that user's "Friends" and a "News Feed," which highlights
information about the user's "Friends," such as profile changes,
upcoming events, and birthdays.

51.  Facebook users can select different levels of privacy
for the communications and information associated with their
Facebook accounts.  By adjusting these privacy settings, a
Facebook user can make information available only to himself or
herself, to particular Facebook users, or to anyone with access
to the Internet, including people who are not Facebook users.  A
Facebook user can also create "lists" of Facebook friends to
facilitate the application of these privacy settings.  Facebook
accounts also include other account settings that users can
adjust to control, for example, the types of notifications they
receive from Facebook.

52.   Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.  Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.  In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times.  A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

53.   Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video.  It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video.  When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video.  For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

54.  Facebook users can exchange private messages on Facebook with other users.  Those messages are stored by Facebook unless deleted by the user.  Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.  In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger.  These chat communications are stored in the chat history for the account. Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

55.  If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

56.  Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (i.e., non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

57.  Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

58.  Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present.  The activity log

includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend.  The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

59.  Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

60.  In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform.  When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

61.  Meta also retains Internet Protocol ("IP") logs for a given Facebook user ID or IP address.  These logs may contain information about the actions taken by the Facebook user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.  For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile and would show when and from what IP address the user did so.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access a SUBJECT ACCOUNT.

62.   Social networking providers like Meta also typically
retain additional information about their users' accounts, such
as information about the length of service (including start
date), the types of service utilized, and the means and source
of any payments associated with the service (including any
credit card or bank account number).

63.   In some cases, Facebook users may communicate directly
with Meta about issues relating to their Facebook accounts, such
as technical problems, billing inquiries, or complaints from
other users.  Social networking providers like Meta typically
retain records about such communications, including records of
contacts between the user and the provider's support services,
as well as records of any actions taken by the provider or user
as a result of the communications.

64.   In my training and experience, the stored
communications and files described above connected to a SUBJECT
ACCOUNT may provide direct evidence of the offenses under
investigation and may constitute evidence of the crimes under
investigation, including information that can be used to
identify the user(s) of a SUBJECT ACCOUNT, as well as how and
when a SUBJECT ACCOUNT was accessed and used.  In addition,
emails, instant messages, internet activity, documents, and
contact and calendar information can lead to the identification
of co-conspirators and instrumentalities of the crimes under
investigation.

65.   Moreover, in my training and experience, a Facebook
user's account activity, logs, and other data retained by Meta

may provide direct evidence of the offenses under investigation, may constitute evidence of the crimes under investigation, and can also be used to identify the user(s) of a SUBJECT ACCOUNT. For example, subscriber information, IP address logs, email and messaging logs, status updates, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date, and time) may be evidence of who used or controlled the account at a relevant time. Facebook account activity can also show how and when the account was accessed or used. Additionally, Meta builds geo-location into some of its social networking services. Geo-location allows, for example, users to "tag" their location in Facebook posts and Facebook "friends" to locate each other. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to a SUBJECT ACCOUNT and the crimes under investigation.

66. Therefore, the computers of Meta are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## VI. BACKGROUND ON THE SEIZURE OF DIGITAL EVIDENCE FROM THE PROVIDERS

67. I know from my training and experience that the complete contents of an account may be important to establishing the actual user who has dominion and control of that account at a given time. Accounts may be registered in false names or

screen names from anywhere in the world with little to no verification by the service provider. They may also be used by multiple people. Given the ease with which accounts may be created under aliases, and the rarity with which law enforcement has eyewitness testimony about a defendant's use of an account, investigators often have to rely on circumstantial evidence to show that an individual was the actual user of a particular account. Only by piecing together information contained in the contents of an account may an investigator establish who the actual user of an account was. Often those pieces will come from a time period before the account was used in the criminal activity. Limiting the scope of the search would, in some instances, prevent the government from identifying the true user of the account and, in other instances, may not provide a defendant with sufficient information to identify other users of the account. Therefore, the contents of a given account, including the email addresses or account identifiers and messages sent to that account, often provides important evidence regarding the actual user's dominion and control of that account. For the purpose of searching for content demonstrating the actual user(s) of a SUBJECT ACCOUNT, I am requesting a warrant requiring the PROVIDER to turn over all information associated with a SUBJECT ACCOUNT with the date restriction included in Attachment B for review by the search team.

68. Relatedly, the government must be allowed to determine whether other individuals had access to a SUBJECT ACCOUNT. If the government were constrained to review only a small

subsection of an account, that small subsection might give the misleading impression that only a single user had access to the account.

69. I also know based on my training and experience that criminals discussing their criminal activity may use slang, short forms (abbreviated words or phrases such as "lol" to express "laugh out loud"), or codewords (which require entire strings or series of conversations to determine their true meaning) when discussing their crimes. They can also discuss aspects of the crime without specifically mentioning the crime involved. In the electronic world, it is even possible to use pictures, images and emoticons (images used to express a concept or idea such as a happy face inserted into the content of a message or the manipulation and combination of keys on the computer keyboard to convey an idea, such as the use of a colon and parenthesis :) to convey a smile or agreement) to discuss matters. "Keyword searches" would not account for any of these possibilities, so actual review of the contents of an account by law enforcement personnel with information regarding the identified criminal activity, subject to the search procedures set forth in Attachment B, is necessary to find all relevant evidence within the account.

70. This application seeks a warrant to search all responsive records and information under the control of the PROVIDER, which is subject to the jurisdiction of this court, regardless of where the PROVIDER has chosen to store such information.

71. As set forth in Attachment B, I am requesting a
warrant that permits the search team to keep the original
production from the PROVIDER, under seal, until the
investigation is completed and, if a case is brought, that case
is completed through disposition, trial, appeal, or collateral
proceeding.

a.    I make that request because I believe it might be
impossible for a provider to authenticate information taken from
a SUBJECT ACCOUNT as its business record without the original
production to examine.  Even if the provider kept an original
copy at the time of production (against which it could compare
against the results of the search at the time of trial), the
government cannot compel the provider to keep a copy for the
entire pendency of the investigation and/or case.  If the
original production is destroyed, it may be impossible for the
provider to examine a particular document found by the search
team and confirm that it was a business record of the provider
taken from a SUBJECT ACCOUNT.

b.    I also know from my training and experience that
many accounts are purged as part of the ordinary course of
business by providers.  For example, if an account is not
accessed within a specified time period, it -- and its contents
-- may be deleted.  As a consequence, there is a risk that the
only record of the contents of an account might be the
production that a provider makes to the government, for example,
if a defendant is incarcerated and does not (perhaps cannot)
access his or her account.  Preserving evidence, therefore,

would ensure that the government can satisfy its Brady
obligations and give the defendant access to evidence that might
be used in his or her defense.

## VII. REQUEST FOR NON-DISCLOSURE

Pursuant to 18 U.S.C. § 2705(b), I request that the Court
enter an order commanding the PROVIDER not to notify any person,
including the subscriber(s) of the SUBJECT ACCOUNT, of the
existence of the warrant until further order of the Court, until
written notice is provided by the United States Attorney's
Office that nondisclosure is no longer required, or until one
year from the date the requested warrant is signed by the
magistrate judge, or such later date as may be set by the Court
upon application for an extension by the United States.  There
is reason to believe that such notification will result in
(1) endangering the life or physical safety of an individual;
(2) flight from prosecution; (3) destruction of or tampering
with evidence; (4) intimidation of potential witnesses; or
(5) otherwise seriously jeopardizing the investigation. The
current investigation set forth above is not public, and I know,
based on my training and experience, that prohibited persons
engaged in the illicit sale of firearms often will destroy
digital evidence if the prohibited persons learn of an
investigation. If suspects are aware of law enforcement
investigations into their activities, confidential informants
and undercover agents are more at risk of being discovered. In
addition, if the PROVIDER or other person notifies the targets
of the investigation that a warrant has been issued for the

SUBJECT ACCOUNTS, the unidentified co-conspirators might further mask their activity and seriously jeopardize the investigation.

### VIII.    <u>CONCLUSION</u>

72. Based on the foregoing, I request that the Court issue the requested warrant.  The government will execute this warrant by serving the warrant on the PROVIDER.  Because the warrant will be served on the PROVIDER, which will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this ____ day of
January, 2025.

_____
HON. ALKA SAGAR
UNITED STATES MAGISTRATE JUDGE